WELD–NEVILLE COTTON CO. v. LEWIS.*
(No. 343.)

(Court of Civil Appeals of Texas. Beaumont. Dec. 12, 1918. Rehearing Denied Feb. 5, 1919.)

1. LIMITATION OF ACTIONS ⟨⟨⟨127(4)—AMENDMENT OF PLEADING—RESTATEMENT OF ORIGINAL CAUSE OF ACTION.

In action for balance due on cotton, amended petition *held* not barred, being merely an amplification of original pleadings; both original and amended petitions asking for same amount and alleging such amount to be the balance due.

**2. APPEAL AND ERROR &=>742(1)—ASSIGN-MENTS OF ERROR—PROPOSITIONS.**

Under rules of Court of Civil Appeals, an assignment of error, not submitting any proposition, but attempting to adopt the assignment as its proposition, will not be considered.

**3. PRINCIPAL AND AGENT &=>123(10)—CREDITING OF PRICE TO THIRD PARTY—AUTHORITY—SUFFICIENCY OF EVIDENCE.**

In action for balance on cotton, evidence *held* to show plaintiff's ownership, and that third party on whose debt to defendant defendant had credited the balance sued for, had no interest in the cotton or authority to collect or receive credit therefor.

**4. CUSTOMS AND USAGES &=>19(3)—SUFFICIENCY OF EVIDENCE—SALE OF COTTON.**

Evidence *held* to show custom whereby cotton was shipped to defendant with draft attached to bill of lading, and whereby defendant, after selling cotton, would pay shipper difference between amount of draft and price received.

**5. SALES &=>239 — INNOCENT PURCHASER — CREDIT ON PRE-EXISTING DEBT.**

A person cannot claim to be an innocent purchaser for value where he credits the purchase price to a pre-existing debt.

Appeal from District Court, Harris County; Henry J. Dannenbaum, Judge.

Action by F. N. Lewis against the Weld-Neville Cotton Company. Judgment for plaintiff, and defendant appeals. Affirmed. See, also, 163 S. W. 667.

Baker, Botts, Parker & Garwood, of Houston, for appellant.

Woods, King & John, of Houston, for appellee.

BROOKE, J. This suit was originally instituted by appellee in the Sixty-First district court of Harris county, Tex., to recover of appellant the sum of $858.35, being the balance due on 60 bales of cotton shipped by appellee to appellant on the 17th day of December, 1910. It was alleged in plaintiff's first amended original petition, filed on November 18, 1912, that on the said 17th day of December, 1910, appellant was engaged in buying and selling cotton in the city of Houston, and frequently and customarily permitted its customers to ship it cotton with draft attached to the bill of lading for an advancement on said cotton, and that said draft and bill of lading would be sent through some local bank and paid by appellant, and, when the cotton was sold, that appellant would account to the shipper for the difference between the amount of the draft and the money received for such cotton when sold; that in pursuance to such custom, appellee, on December 17, 1910, delivered to the agent of the International & Great Northern Railroad Company at Lovelady, Tex., 60 bales of cotton consigned to appellant at Houston, Tex., and attached said bill of lading to a draft drawn against appellant for the sum of $3,500 and exchange, and delivered same to the First National Bank of Lovelady, Tex., and that upon presentation of said draft through the First National Bank of Houston, Tex., the same was paid by appellant and the bill of lading delivered to it, and that appellant received from said railroad company said 60 bales of cotton, and sold the same for the sum of $4,362.60, and was therefore due appellee the difference between said draft and exchange and said sum of $4,362.60, amounting to the sum of $858.35, which appellant had failed and refused to pay.

The case was tried before a jury and resulted in a verdict and judgment in favor of appellee for the amount sued for, and upon appeal the same was reversed and remanded by the Court of Civil Appeals for the El Paso district, upon an alleged error in the charge of the court. Weld-Neville Cotton Co. v. Lewis, 163 S. W. 667.

On the 4th day of January, 1917, appellee filed his third amended original petition, containing every allegation contained in his amended petition, upon which the case had theretofore been tried, but amplifying and elaborating on said petition. In this last-mentioned amended petition, appellee alleged that one C. C. May, on or about the 17th day of December, 1910, was in the town of Lovelady, where appellee then resided, notoriously representing himself to be a member of Weld-Neville Cotton Company, as he had frequently theretofore done, and solicited appellee to ship 60 bales of cotton through the First National Bank of Houston, to appellant company, with bill of lading attached to draft in the sum of $3,500, and exchange, to be sold by appellant company in accordance with the custom of said company and other cotton concerns similarly situated; that is to say, that whatever amount said cotton sold for over and above the draft was to be remitted by appellant to appellee. At the conclusion of the testimony, the court peremptorily instructed the jury to return a verdict in favor of plaintiff for the sum of $858.35, with interest thereon from February 1, 1911, until paid, at the rate of 6 per cent. per annum, and said verdict was returned, received by the court, and filed, and judgment entered accordingly. The case has been transferred to this court from the Court of Civil Appeals at Galveston.

Appellant's first assignment of error is grouped with the seven following assignments on account of their intimate and close relation to the action of the court. These assignments are as follows:

"(a) The court erred in overruling the defendant's exception No. 2, as contained in defend-

&=>For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ant's third amended original answer, reading as follows: 'Defendant specially demurs and excepts to said third amended original petition, because the same sets up a new cause of action from that set up by plaintiff in his original and first amended original petition, and that said original and first amended original petition, together with said third amended original petition, show upon their face that said new cause of action as set up in said third amended original petition is barred by the statutes of 2 and 4 years' limitation, which are here now invoked by defendant, and of this exception judgment of the court is prayed.'

"(b) The court erred in overruling defendant's exception No. 11, as contained in defendant's third amended original answer, reading as follows: 'In the event the special exception in paragraph 2 hereof be overruled, and only in the alternative, this defendant especially excepts to that portion of plaintiff's third amended original petition set forth in paragraph 2 thereof, which alleges: "That heretofore, to wit, during the fall of 1910 and the winter of 1910–1911, the defendant was, and is now, engaged in buying and selling cotton, in the city of Houston, Harris county, Tex., and that one C. C. May was, during said fall and winter, buying cotton in the town of Lovelady, Houston county, Tex., where plaintiff then resided, and in other towns in that section of the state, and was representing himself to the trade, and especially to this plaintiff, that he was a member of the firm of Weld-Neville Cotton Company, and was authorized by said company to buy, and was buying, cotton for it, and that said representations were public, and frequently made throughout that section of the state, all of which was well known to the defendant, or by the exercise of ordinary care could have been known to defendant"—because said allegation sets up a new and different cause of action than that set up in plaintiff's first amended original petition, which said new cause of action is barred by the statutes of limitation, which are here now invoked, and of this the defendant prays the judgment of the court.'

"(c) The court erred in overruling defendant's exception No. 12, as contained in defendant's third amended original answer, reading as follows: 'In the event the special exception in paragraph 2 hereof be overruled, and only in the alternative, this defendant especially excepts to that portion of plaintiff's third amended original petition set forth in paragraph 3 thereof, which alleges: "That during said fall, and prior to and after December 17th, A. D. 1910, and for several weeks thereafter, this plaintiff sold to the defendant, Weld-Neville Cotton Company, through the said C. C. May, on several different occasions, a number of bales of cotton, and shipped same to defendant, in Houston, Tex., with bill of lading attached to a draft for the purchase price of said cotton, and on each and every occasion such draft was protected by the defendant company"—because said allegation sets up a new and different cause of action than that set up in plaintiff's first amended original petition, which said new cause of action is barred by the statutes of 2 and 4 years' limitation, which are here now invoked, and of this the defendant prays the judgment of the court.'

"(d) The court erred in overruling defendant's exception No. 13, as contained in defendant's

third amended original answer, reading as follows: 'In the event the special exception in paragraph 2 hereof be overruled, and only in the alternative, this defendant especially excepts to that portion of plaintiff's third amended original petition set forth in paragraph 5 thereof, which alleges: "That on or about the 17th day of December, A. D. 1910, the said C. C. May was in the town of Lovelady, where plaintiff then resided, notoriously representing himself to be a member of the firm of Weld-Neville Cotton Company, as he had frequently theretofore done, and solicited plaintiff to ship 60 bales of cotton, which plaintiff then owned, from Lovelady to the city of Houston, consigned to the First National Bank of Houston, with instructions to notify defendant company, with bill of lading attached to a draft for the sum of $3,500, and exchange, to be sold by defendant company in accordance with the custom of defendant company and other cotton concerns similarly situated; that is to say, that whatever amount said cotton sold for, over and above the draft mentioned above, was to be remitted by the defendant company to plaintiff"—because said allegation sets up a new and different cause of action than that set up in plaintiff's first amended original petition, which said new cause of action is barred by the statutes of 2 and 4 years' limitation, which are here now invoked, and of this the defendant prays the judgment of the court.'

"(e) The court erred in overruling defendant's exception No. 14, as contained in defendant's third amended original answer, reading as follows: 'In the event the special exception in paragraph 2 hereof be overruled, and only in the alternative, this defendant especially excepts to that portion of plaintiff's third amended original petition set forth in paragraph 6 thereof, which alleges: "Plaintiff would further represent that he had no reason to believe that the said C. C. May was not connected with the said Weld-Neville Cotton Company, or was not an officer or member of said company, and as he had made several sales of cotton to the said defendant company through the said C. C. May prior to the said 17th day of December, 1910, always shipping said cotton direct to the Weld-Neville Cotton Company, of Houston, Tex., with a bill of lading attached to a draft for the contract price of said cotton, and knowing that the said C. C. May had for a long time been openly, promiscuously and notoriously representing himself to be an officer of, or connected with, the said Weld-Neville Cotton Co., your plaintiff naturally believed that such were the facts, but in shipping the 60 bales as aforesaid to the defendant company, said cotton was consigned to the First National Bank of Houston, with instructions to notify the Weld-Neville Cotton Company, and a draft was drawn for the said $3,500, plus the exchange, attached to bill of lading, and that the said C. C. May's name did not appear anywhere in said bill of lading or on said draft, and there was nothing about the said transaction or said papers to indicate to the defendant company that the said C. C. May was authorized to collect the balance due, or in any wise interested in said sale, and the said May was not authorized to collect for said cotton"—because said allegation sets up a new and different cause of action than that set up in plaintiff's first amended original petition, which

said new cause of action is barred by the statutes of 2 and 4 years' limitation, which are here now invoked, and of this the defendant prays the judgment of the court.'

"(f) The court erred in not sustaining the defendant's exception to the court's charge as set forth in paragraph 23 of the defendant's written exceptions to said charge, reading as follows: 'Defendant objects and excepts to said charge, because in plaintiff's original petition, filed on June 6, 1911, and in plaintiff's first amended original petition, filed on November 18, 1912, plaintiff alleged that defendant was liable to him, and sued for the difference between the amount of the draft of $3,500 and the market value of the cotton on the day of its arrival in Houston; and in plaintiff's third amended original petition filed on January 4, 1917, and being the pleading upon which the cause was tried, alleged defendant was liable to him, and sued for the difference between the amount for which the cotton sold, alleging it to have been sold for $4,362.60, which said third amended original petition therefore set up and alleged a new and different cause of action from that set up and alleged in the original and first amended original petitions, and said new and different cause of action, so set up and alleged, not having been filed until more than 6 years after the alleged cause of action arose, it was barred by the statutes of 2 and 4 years' limitation.'

"(g) The court erred in not sustaining the defendant's exception to the court's charge as set forth in paragraph 1 of defendant's written exceptions to said charge, reading as follows: 'Defendant objects and excepts to the said charge, because the third amended petition filed by plaintiffs herein on January 4, 1917, and being the pleading upon which said cause was tried, sets up a new and different cause of action from that set up and alleged by plaintiff in his original and first amended original petitions, and said third amended original petition, together with said original and first amended original petition, show upon their face that said new and different cause of action as set up and alleged in said third amended original petition is barred by the statutes of 2 and 4 years' limitation.'

"(h) The court erred in not sustaining the defendant's exception to the court's charge, as set forth in paragraph 24 of the defendant's written exceptions to said charge, reading as follows: 'Defendant objects and excepts to said charge, because in plaintiff's original petition filed on June 6, 1911, and in plaintiff's first amended original petition filed November 18, 1912, the right to recover, alleged by the plaintiff, was that it was the custom of the defendant to have its customers throughout the state of Texas ship it cotton to Houston and to pay them therefor the market value of the cotton on the day of its arrival in Houston, and that in pursuance of this custom he had shipped the defendant the cotton involved in this suit, and the defendant, because of the custom, was obligated to pay him the difference between the market value of the cotton on the day it arrived in Houston and the amount of the draft which accompanied the shipment; while in plaintiff's third amended original petition filed January 4, 1917, and being the pleading upon which the case was tried, the right to recover alleged by the plaintiff was that one C. C. May, who plaintiff thought was a representative of defendant, solicited plaintiff to ship said cotton to the First National Bank of Houston, with instructions to notify defendant, with bill of lading attached to a draft for the sum of $3,500, and exchange, to be sold by defendant in accordance with the custom of defendant company and other cotton concerns similarly situated, that is to say, that whatever amount said cotton sold for over and above the draft mentioned above was to be remitted by the defendant company to plaintiff, which said third amended original petition therefore set up and alleged a new and different cause of action than that set up and alleged in the original and first amended original petitions, and said new and different cause of action so set up and alleged in the original and first amended original petitions, and said new and different cause of action so set up and alleged not having been filed until more than 6 years after the alleged cause of action arose, it was barred by the statutes of 2 and 4 years' limitation.' "

There are several propositions under these assignments, which are being considered as a whole, as follows:

"(1) A cause of action based upon an alleged express agreement, with an alleged representative of the person sought to be charged—the terms of such agreement to be determined by a certain alleged custom—is a new, distinct, and different cause of action from one based solely upon an alleged custom.

"(2) As plaintiff's original petition and first amended original petition alleged solely a liability of defendant growing out of an alleged custom, and plaintiff's third amended original petition alleged solely a liability of defendant upon an alleged express agreement with an alleged representative of defendant, the terms of such agreement to be determined in accordance with an alleged custom, the plaintiff's new cause of action was barred on its face by the 2 and 4 years' statutes of limitation."

On the contrary, it is urged that the amended petition upon which the case was tried is merely an enlargement or amplification of the original cause of action, and is not a new cause of action, but a continuation of the old, and was therefore not barred by the statute of limitations, and that the facts alleged in the last-amended petition upon which the case was tried related to the same transaction as those set up in the original pleadings, and was therefore not barred by the statute of limitations.

[1] After a careful consideration of the case, and the different phases of the same, we are of the opinion that no new or different cause of action was alleged in this new pleading, but that the same was merely an amplification of the old pleadings and a continuation of his original suit. The amended petition upon which the case was tried is merely an enlargement or amplification of the original cause of action, and a perusal of the last two amended petitions will show that there is no difference in the cause of action alleged; that the last petition contains all of the allegations of the other petitions, and said allegations are

therefore adopted in the pleading last filed, and that said last pleading is merely an amplification of the other.

Judge Townes, in his work on Pleadings, on pages 456 and 457, lays down the following rule:

"If a case were brought charging fraud in general terms, there can be no doubt that an amendment can be made specifying particular facts as constituting the fraud, and that this would be the same cause of action. Suppose afterward another amendment were made setting up still other facts concerning the same transaction constituting a distinct fraud so different from that set up in the first amendment as not to have been admissible under its allegations. Here, there would be a different cause of action in the second amendment from that set up in the first, but both would be included under the general charge of fraud, as set out in the original, and the second amendment should be permitted as a continuance of the original suit, but if the facts alleged in the second amendment related to different transactions, although they might be fraudulent, or if they related to the same transaction, but have no connection with fraud, but alleged some matters of a different nature, the second amendment would set up a new cause of action, and be regarded as equivalent to bringing a new suit, as to such matters.

"This is the real result of the recent decisions, though expressed in different language from that employed by the judges. Leaving out any reference to the phrases, 'cause of action,' or 'ground of difference,' we may say that our courts have held that if the amendment sets up facts regarding the same transaction as those set up in the original pleading and so germane to it that it is reasonably apparent from the pleadings that they refer to the same matters, and that it was the intention of the pleader in preparing the former pleading to litigate the matters set up in the amendment, the amendment will be regarded as a continuance of the suit, and not the institution of a new one."

In Cyc. vol. 25, p. 1305, we find the following:

"Where plaintiff, by amendment sets up no new matter or claim, but merely relates in a different form, more correctly and specifically, the same cause of action set out in the original declaration, it is not a new suit, and the statute will not avail for the period between the original and amended pleadings. Where the original declaration states the cause of action, but does it imperfectly, and afterward an amended declaration is filed, correcting the defect, the pleading of the statute of limitations will not relate to the time of filing of the original declaration."

On page 1310, Cyc., we find the following:

"An amendment changing the form of an action will not open the case to the bar of the statute of limitation if the cause of action is not changed. So long as the identity of the cause of action is preserved, the form of the action is not material. If, however, change in the form of the action introduces new and distinct cause of action, limitations do not cease to run until the amendment is made."

In the case of Mayer et al. v. Walker, 82 Tex. 222, 17 S. W. 505, the following language is used:

"The second and third amended petitions contained substantially the same cause of action. The statute of limitations therefore in no way affected the right to recover in the action included in both, from the time originally declared on."

In the case of The Oriental v. Barclay, 16 Tex. Civ. App. 193, 41 S. W. 117, it is held that where a substantial cause of action for personal injuries has been pleaded, the enlargement of the allegations as to specific injuries by amendment is not affected by the statute of limitation.

In the case of Chicago City Ry. Co. v. McMeen, 102 Ill. App. 318, it is held that in an action for personal injuries, an amendment count which states a different place at which the injury took place is not amenable to the plea of limitation, and it is not the statement of another cause of action. Also in the cases of Caswell v. Hopson, 47 S. W. 54, and Railway Co. v. Eberhart, 40 S. W. 1060, it is held that an amendment to a declaration, amplifying and enlarging upon the manner in which an accident occurred, and stating more clearly the negligence complained of, is not barred by limitation, if the cause of action was brought within the time prescribed by statute. In the case of Cogswell v. Hall, 185 Mass. 455, 70 N. E. 461, it is held that the question whether plaintiff intended, when he brought his action, to include the substance of the amended count as a part of his damage is within the discretion of the trial court.

It seems that in this case in every pleading filed by appellee in this suit, he sued for identically the same amount of money, alleging in each instance that it was the balance due him after the sale of 60 bales of cotton that was shipped by appellee to appellant on the 17th day of December, 1910, and the last pleading filed by him merely goes into details and explains the circumstances under which said cotton was shipped and the reasons for shipping the same without a previous agreement so to do with the appellant company. Townes' Texas Pleading (2d Ed.) pp. 456, 457; Mayer v. Walker, 82 Tex. 222, 17 S. W. 505; The Oriental v. Barclay, 16 Tex. Civ. App. 193, 41 S. W. 117; Caswell v. Hopson, 47 S. W. 54; Texas, etc., Ry. Co. v. Eberhart, 40 S. W. 1060; Chicago City Ry. Co. v. McMeen, 102 Ill. App. 318; Cogswell v. Hall, 185 Mass. 455, 70 N. E. 461; Cyc. vol. 25, pp. 1305–1307, 1310.

It is claimed by appellee that appellant's ninth assignment of error is in violation of the rules of the court, in that it does not submit any proposition under said assignment, but attempts to adopt the assignment as its proposition, and it is urged that it is a well-

settled rule that the mere adoption of an assignment of error as a proposition does not constitute same as a proposition, and that to designate said assignment of error as a proposition would, in effect, nullify this rule, as the assignment cannot be in any manner considered a proposition, and appellee therefore moves the court to disregard and not consider said assignment.

[2] We find the facts to be as stated by appellee, and therefore we are of opinion that the ninth assignment of error is in violation of the rules of this court, and the same will not therefore be considered.

The tenth assignment of error challenges the action of the court as being error in refusing defendant's requested charge No. 2, which reads as follows:

· "You are instructed that the evidence does not support the case alleged, and you will return your verdict for the defendant."

This is embraced in what has been before said with reference to the question not being a new cause of action, and it is therefore unnecessary to further consider the tenth assignment.

The eleventh assignment of error challenges the action of the lower court as being error in permitting the witness F. N. Lewis, while testifying on behalf of plaintiff, to testify as to any representation made by C. C. May as to his connection with the defendant company, and as to such representations made by said May to the witness the defendant objected to such testimony because the plaintiff had not introduced any evidence connecting the said May with the Weld-Neville Cotton Company, and defendant objected to any representations made by said May until plaintiff had first shown that defendant company knew of those representations, and that they were brought to its notice in some way, and further that the statements of the said May would not be sufficient, and it is urged that proof of agency must be traced to its source in some word or act of the alleged principal.

[3] Upon this whole case it is shown that there is no material difference in the cause of action alleged in the petition last filed. The undisputed testimony was substantially as alleged, that appellee was the owner of the cotton shipped, and May had no interest therein, and no authority to collect for same, and no one but appellee was authorized to receive the amount sued for, and that appellant was due and owing appellee the amount sued for, and had failed and refused to pay the same, although often requested so to do, but had credited said amount on a pre-existing debt due by said May to appellant, without authority from appellee. The appellee testified in his own behalf as follows:

"It was the 12th of December that I first met May. * * * I sold him 30 bales of cotton. To pay me for said 30 bales, May drafted on the Weld-Neville Cotton Company for the amount, $2,238.98. * * * He tried to buy part of this lot that is in controversy, looked at 31 bales of it on December 12th, and I did not want to sell it. I told him I paid a pretty high price for it. I had 31 bales of this lot in controversy, there on the platform, and May tried to buy it, and I told him I did not care to sell it right then, but I wanted to wait a few days on account of a bureau report that was due. * * * Then May asked me to ship the cotton to the Weld-Neville Cotton Company to be handled by them. He said they would take care of it for me, and would charge me no storage, no interest and no commission. * * * At that time I had been in the cotton business 3 or 4 years. I knew the Weld-Neville Cotton Company. The Weld-Neville Cotton Company had a custom within my knowledge with reference to people shipping cotton to it with bill of lading attached for part of the purchase price. * * * I knew people shipped the Weld-Neville Cotton Company cotton during that time and the fall preceding December, 1910. * * * Evans & Co. are a cotton firm, and had made me the same proposition, that I could consign cotton to them and draw within $10 per bale of the worth of the cotton. The way I would consign it to them was, I would put the cotton on the platform of the International & Great Northern Railway Company, and would have a bill of lading made for it, which would be consigned by the agent of the railroad company, * * * and I would consign the cotton to Weld-Neville Cotton Company or to Evans & Co., and attach a draft to the bill of lading. I would not draw the draft for the full value of the cotton. I would generally leave a margin of $10 or $15 per bale. That had been my custom with Evans & Co. * * * They buy a lot of cotton. I had known of others shipping cotton to the Weld-Neville Cotton Company that way.

"On December 12, 1910, Mr. May solicited me to ship cotton to Weld-Neville Cotton Company in the way I have stated. I shipped cotton as Mr. May asked me, and made a bill of lading to the Weld-Neville Cotton Company. I did not bill it to Mr. May. I shipped 60 bales. * * * I turned said bill of lading over to the bank at Lovelady, and accompanying said bill of lading I gave the bank a draft for $3,504.25, of which amount $4.25 represented the exchange for handling the draft. * * * I instructed the bank at Lovelady to send said draft and bill of lading to Houston and get the money, as they had been doing. I do not know anything about said indorsement; it was not on the draft when I delivered it to the bank.

"I shipped this cotton to Weld-Neville Cotton Company under such a custom. I shipped the cotton down to Weld-Neville Cotton Company with draft attached, expecting that they would pay the draft and account to me for the difference, upon what the cotton sold for at the market price of the cotton at the time it was received in Houston.

"The bill of lading that has been introduced here bears the indorsement of the First National Bank of Lovelady; I made it payable to them, and they indorsed it, and when it was indorsed by said First National Bank of Lovelady it, together with the draft, was sent to Houston for collection. That was done in accordance

with the custom alleged in my petition. That custom was to ship the cotton and draw on it for part of it, and then they account to me for the balance when it was sold. That has always been the custom since I have been in the cotton business. When it was sold, they would account to me for the market value the day it was sold.

"There was only one draft made before the shipment involved in this suit, and that was December 12, 1910, and I sold that cotton to Mr. May. That was the first cotton I sold to May, but I sold Weld-Neville a lot of cotton before that."

It was admitted that A. C. Cairnes was the executive officer of appellant company.

"When I talked with Cairnes, he told me when some of that cotton arrived in Houston. * * * He said he sold it as soon as it got to Houston. Cairnes showed me the dates the cotton was sold, and he told me he sold it on arrival in Houston. * * * I think he said it arrived in Houston on the 23d of December. I had been writing to May instead of Weld-Neville Cotton Company, because he claimed to be one of the firm, and was familiar with him. When I came down and saw Mr. Cairnes. * * * I asked him what he had sold it for, and Mr. Cairnes turned to the bookkeeper and asked him to get the amount it brought, and he said the amount due me was $858.35. He told me then that the cotton brought $858.35 over the amount of my draft. * * * I have made many shipments of cotton from Lovelady to Houston. Ordinarily, it takes from four to ten days for cotton to arrive in Houston from the time I deliver it to the railroad company at Lovelady; sometimes it is a little longer. I know the market value of cotton, and also in Houston on December 20, 1910. Said market value was about 15 cents a pound, and stayed there for quite a while. I think it went little above 15 cents, but I would not be positive how much. * * * It went down very little, if any, from the 20th of December, 1910, to the 6th of February, 1911. It stayed at 15 cents basis middling, and the other 7 or 8 bales, whichever it was, brought three-eighths less.

"The second time I came down to see Cairnes he asked me how I came to ship that cotton to him. I told him I had talked with May about it when I sold him him that first list. I did not ship it right straight, but later on I shipped it with the understanding that May would take care of the draft and turn the balance over to me when it was sold, as that was the custom and he said that was the custom with them. I told him about having an understanding that such was the custom with the other firms, and he told me it was the same with them.

"I told him (Cairnes) that was my understanding of the custom. He said that was the custom, and he said that was their custom, and said also that he sold the cotton on arrival. Cairnes said it was their custom to handle cotton that way. I sold the first lot of cotton to May on the 12th of December. * * * May looked at the 31 bales of cotton while he was there. * * * I told May I did not want to sell it until after the Bureau Report, which was due on the 20th. I did not ship that cotton out at once because I did not want it to reach Houston sooner than the 20th. I held it over

until the 17th, so that it would not reach Houston before the 20th. I remember too, it was very late in the evening of the 17th that the bill of lading was turned over to me, and they never loaded until the next day, and then they do not usually ship until the following day, and sometimes later."

There was introduced in evidence draft dated December 12, 1910, for the sum of $2,-258.98, marked "Exhibit A," draft dated January 14, 1911, for the sum of $5,006.79, marked "Exhibit D," draft dated January 18, 1911, for $2,538.06, marked "Exhibit E," and all drawn by Cutler May in payment of cotton purchased by May from appellee. and drawn against appellant company and by it paid.

These drafts and transactions were offered for the purpose of showing that May was buying cotton for the account of appellant and drawing drafts against appellant in payment for same, and as showing authority to the said May by appellant company to represent it in the purchase of cotton.

John I. Moore testified for appellee as follows:

"I live at Crockett, and have been practicing law there for about 30 years. Mr. Lewis placed the claim against Weld-Neville Cotton Company, that is the basis of this suit, in my hands for collection, and I then came to Houston to the office of said company, and was introduced to a man, or perhaps I introduced myself to him, who called himself Cairnes. * * * I took up with him the matter of the claim of Mr. Lewis in reference to the balance due on the shipment of the 60 bales of cotton in controversy here, and he wanted us to see a man by the name of May. * * * Cairnes wanted me to see May before he would talk to me further about the business, and we went to see May.

"May did not pay me the difference, and the young man and I took the car and came back to see Cairnes, and I had a conversation with Cairnes after we came back.

"Cairnes had his bookkeeper * * * show me his books, and he pointed out to me $858.35 is my recollection as the amount that was due on the cotton over and above the draft.

"Cairnes told me what had been done with that $858.35. He said it had been placed to the credit of C. C. May. Cairnes told me that May had been buying cotton for them and drawing on them for money, and had gotten in debt to the Weld-Neville Cotton Company, and he placed that amount to May's credit to balance his account, and it a little more than balanced it. * * * That the amount of $858.35 overbalanced May's account $1.39, and that amount was still due May, and he led me to believe that I could have gotten that amount that day, but I would not take it."

This testimony was uncontradicted, and appellant did not offer its books to show that this balance or any part thereof had been paid to May, believing that May owned the cotton, but the record stands uncontradicted that appellant company merely gave May credit for this amount in order to balance

the amount that May was due appellant company on other transactions.

Cairnes did not appear and testify in this cause upon this trial, but testified in the former trial, and by agreement his testimony upon said former trial was used upon the last trial, and appellee introduced in evidence the cross and recross-examination of said Cairnes, as follows:

"The first connection I had with Mr. Lewis, the plaintiff in this suit, with reference to this cotton or any other cotton, was this letter dated February 6, 1911. He never at any time instructed me to pay Mr. May any sum of money that might be due him. * * *

"This draft, dated December 17th, for $3,504.25 was drawn by the plaintiff in this case. That had a bill of lading attached to it for 60 bales of cotton. That would indicate that Mr. Lewis was the owner of that cotton and the drawer of the draft. I had no other information from Mr. Lewis or any one else except what Mr. May might have told me as to the ownership of that cotton. Mr. May's name did not appear on this draft or on the bill of lading at the time it was presented by the bank. This notation of C. C. May was made after it was presented. That notation was not made at the time the draft was drawn, but we had it indorsed by Mr. May. We had that done merely for our own protection; I wanted that guaranty that it was all right. That was the purpose of having Mr. May indorse it. I don't know that there was anything about the draft or about the bill of lading that led me to believe that Mr. May had anything to do with that shipment, except his own word for it. I just assumed because he had been buying some cotton at Lovelady that he was authorized to receive the balance due, and the fact that it is very unusual for a person to ship people cotton without telling them about it. * * * After we got the cotton and had it weighed and graded, I knew then that it did not represent the full value of the cotton. That was before I settled with Mr. May. I knew before I settled with Mr. May that that draft drawn by F. N. Lewis did not represent the full value of the cotton. When that cotton was sold, there was a balance due of $858.35. That money was either paid to Mr. May or credited to his account. I don't know whether it was paid to him in cash or whether Mr. May was just indebted to us on some other sale.

"I think that the value of the cotton at the time that it arrived here was about the same as the price it was sold for; I am not sure about that. * * * There was a telephone line between here and Lovelady. I did not think to call Mr. Lewis up when Mr. May demanded payment for the balance due on that cotton and ask him if it was all right to pay it. I did not attempt to communicate with Mr. Lewis in any way with reference to the balance due on that cotton; I merely accepted Mr. May's word for it and paid him the money.

"We do frequently have customers ship us cotton with draft attached for advancement on the cotton after notifying us that they are doing so, and we take that cotton and pay the draft and sell the cotton and remit the balance due them on the sale, upon instructions. * * * Supposing that yourself or some perfect stran-

ger had gone to me after I received that draft and asked me to settle for the balance on that cotton. I would not have done so, because you are a stranger. Mr. C. C. May was not. I trusted Mr. May because I knew him. I would not have trusted any one I did not know; I trusted Mr. May because I knew him, and believed he was honest. There is nothing about the bill of lading to indicate that he had anything to do with the cotton or the draft."

[4] The undisputed testimony shows the custom alleged in appellee's pleadings, such custom being admitted by appellant through its executive officer, who testified, A. C. Cairnes. It is true that Cairnes testified that this was only its custom with its customers, but it is shown by the uncontradicted testimony that appellee was one of appellant's customers, he having sold various lots of cotton to appellant company, sold by him to appellant through C. C. May. Appellee also testified, which testimony was uncontradicted, that he had made numerous shipments of cotton to appellant company prior to the date of this shipment in question. It is also uncontradicted that May was buying cotton as the agent and representative of appellant company, in that he was buying cotton and especially of appellee, and paying for same with drafts drawn against appellant company, which said drafts were delivered to appellee, deposited in the bank, and paid by appellant. Cairnes admitted that he relied solely upon May's statement as to the ownership of the cotton, and that there was nothing about the draft or the bill of lading that indicated that May had any interest in the proceeds of the sale of the cotton, and that he knew that the draft did not represent the full value of the cotton, and that appellant was to account to the owner for such balance. It is uncontradicted that May had no interest in this money, and that he had no authority from appellee to collect the same, and, appellant having failed to show that it paid May such balance on cash without notice of appellee's claim, and believing that May had authority to collect same, and that such balance belonged to him, there was no estoppel in the case, since appellant merely credited May's account with such balance to cover up an amount of money due by May to appellant. In other words, appellant is not an innocent purchaser of said cotton for value, and, having credited a preexisting debt due by May to appellant, it cannot defeat the payment of this sum of money to the rightful owner and person entitled to receive the same.

[5] Attorney Moore testified, without contradiction, that Cairnes told him that May had been buying cotton for appellant, and had overdrawn his account, and that he had merely credited May's account with this balance due appellee on this shipment of cotton, and that, after doing so, there was a bal-

ance standing to the credit of May of $1.39. Had appellant paid May this $858.35 in cash, believing that he was the owner of the cotton and entitled to collect said money and without notice of appellee's claim and ownership, we would have an entirely different case, but the rule is too well settled to justify argument that a person cannot claim to be an innocent purchaser for value where he credits the purchase price to a pre-existing debt. Even though the cotton had been shipped direct to May instead of to appellant, and May had sold same to appellant and had the proceeds of the sale credited to a preexisting indebtedness, appellant could not defend the suit brought by appellee for the value of said cotton. May was merely soliciting appellee to ship this cotton to appellant, explaining to appellee the custom, the existence of which appellant admits, and, appellee not desiring to sell same before the 20th of December, when the government report was due, he does not ship the same at the time May solicited him, but waits until the 17th of the month in order that the cotton would be sure not to reach Houston before such report was due. The uncontradicted testimony shows that the price of the cotton remained from the 20th for several days about the same, and then began to gradually decline, and, assuming that the cotton reached Houston before it was sold, appellant could not complain of the amount of the judgment rendered, because appellee only recovered judgment for the amount that appellant admitted the cotton was sold for, which could not have been more than it would have been had the cotton reached Houston on the 20th or any date prior to the date when it was sold. Cairnes admitted, however, that the cotton was sold immediately upon receipt of same in Houston, and that there was a balance due of $858.35.

In the case of Uvalde National Bank et al. v. R. E. Brooks, 162 S. W. 957, it seems that suit was brought against R. E. Brooks et al., who were directors and stockholders of a certain corporation, for the sum of $5,000, on an express promise to pay. The undisputed testimony showed that the cashier of said bank, at a meeting of the board of directors of the corporation, offered in behalf of his bank to loan said corporation $5,000, which it was then in need of, if the directors present would obligate themselves to pay same. One of the directors spoke up and stated that they had just as well owe the Uvalde National Bank as any bank that they were contemplating getting the money from, while the others of the directors replied that they did not propose to put any more money into the corporation, and the meeting broke up without any further understanding. Later on, however, a draft was drawn by one of the directors or officers of said corporation for the $5,000, and it was paid by the bank, and, the corporation having defaulted in payment of same, suit was brought by the bank against the directors, alleging an express promise to pay. The directors defended upon the ground that there could have been nothing more than an implied promise to pay, and that, appellant having alleged an express promise to pay, it could not recover upon showing nothing more than an implied promise. The trial court sustained the contention of the directors, and upon appeal the case was reversed (162 S. W. 957), and a writ of error denied to the Supreme Court.

We have considered each and every assignment of error in the brief filed by appellant, and upon a careful consideration, not only of the main questions presented, but of the entire case, we are of the opinion that under the undisputed testimony in this case the judgment should have been in favor of the appellee, and therefore we overrule all of appellant's assignments, believing that what we have said entirely covers the points raised in the case by the various assignments.

The judgment of the lower court should be affirmed, and it is accordingly ordered.